# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

FRANCIS R. MURPHY,

      Plaintiff,

    v.

EVAN MCKNIGHT, et al.,

      Defendants.

Case No. 1:23-cv-588

JUDGE DOUGLAS R. COLE

## OPINION AND ORDER

Based on his September 18, 2022, arrest, Plaintiff Francis R. Murphy brought fourteen claims against the various Defendants in this matter. (Doc. 1). Those Defendants—Evan McKnight, Chance Blankenship, Brandon Blankenship, Corey Allison, and the City of Ironton, Ohio—now move for summary judgment on all claims. (Doc. 42). For the reasons below, the Court **GRANTS** Defendants' motion. (Doc. 42). As a result, the Court also **DENIES** Murphy's two motions to exclude the expert report of Kevin R. Davis as **MOOT**. (Docs. 18, 47).

## BACKGROUND[1]

The individual Defendants are the police officers who arrested Murphy. The other Defendant is the city that employs them. Murphy's claims boil down to two

---

[1] In recounting the case's factual background on a motion for summary judgment, the Court relies on the Defendants' proposed undisputed facts, submitted as part of their briefing as the Court's standing order requires. (*See* Doc. 42-2). But here, Plaintiff disputes many of the facts Defendants listed in that filing. (*See* Doc. 44-1). As to disputed facts, the Court generally is "required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (first quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); and then citing

grievances: (1) the officers unlawfully arrested him, and (2) the officers used excessive force in effectuating that arrest. (*See generally* Doc. 1). But those two basic complaints give rise to a host of state and federal claims. (*Id.*).

The events in question kicked off when Officer Evan McKnight performed a traffic stop on Misty Robinson, a non-party who was driving Murphy's truck with a suspended license. (Defs.' Proposed Undisputed Facts, Doc. 42-2, #1088). Jeannie Murphy, the Plaintiff's wife, was a passenger. (*Id.*) Given that the driver of the vehicle (Robinson) did not have a valid driver's license, and "Ms. Murphy was unable to drive," Officer McKnight decided[2] to impound the vehicle. (*Id.*). So, along with the other officers, McKnight began to inventory Murphy's truck.[3] (*Id.*). Murphy claims that the officers did so because they were "looking for probable cause to search the vehicle." (Doc. 44-1, #1439 (citing McKnight Dep., Doc. 38, #840)).

At this point, Murphy arrived on the scene. (Doc. 42-2, #1088). Visibly upset[4] that officers were taking inventory of his vehicle, he engaged in discussion with Officer McKnight. (*Id.*). During that conversation, Murphy refused to relocate to the

---

*Saucier v. Katz*, 533 U.S. 194, 201 (2001)). That said, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380. And here, like in *Scott*, the record contains video footage of the incident. *Id.* at 380–81.

[2] Murphy disputes "McKnight's state of mind" regarding the decision to impound the vehicle. (Pl.'s Resp. to Proposed Undisputed Facts, Doc. 44-1, #1439).

[3] The undisputed facts do not clarify when exactly the other three officer-Defendants— Chance Blankenship, Brandon Blankenship, and Corey Allison—each showed up to the scene. (Doc. 42-2, #1088). But at least three of the four officers appear on the body-camera footage before the inventory search begins. (*See* McKnight Body-Camera Footage, Doc. 40, 1:15). Regardless, all four were present by the time of Murphy's arrest. (*See* Doc. 42-2, #1088).

[4] As noted, the Court has video footage of the events.

nearby area of the sidewalk that McKnight indicated, despite the officer ordering him to do so six times. (Doc. 44-1, #1440 (citing Doc. 40, 15:57, 16:16, 17:10, 19:12, 20:19, 23:12, 23:47, and 28:02)). Murphy also told McKnight that he was going to record the goings-on, to which McKnight did not object. (Doc. 42-2, #1088). While attempting to film (and still disregarding McKnight's directions on where to stand), Murphy moved into a carport on a third party's private property where he did not have permission (either the landowner's or the officer's) to be. (*Id.*). At that point, Officer McKnight placed Murphy under arrest for obstructing official business.[5] (*Id.*); *see* Ohio Rev. Code § 2921.31.

The body-camera footage establishes the timeline for the key events. Approximately one minute and forty-five seconds passed from when Murphy first appeared on the scene (or at least from when his voice is heard) to when Officer McKnight began the arrest. (Doc. 40, 13:45–15:30). That arrest happened over the next seventy-five seconds, which is where the parties' characterizations begin to seriously diverge. (*See id.* at 15:30–16:45).

Let's start with the facts on which the parties agree. Officer McKnight began the arrest, and Officers Blankenship and Allison came to assist him. (Doc. 42-2, #1088). McKnight told Murphy to put his hands behind his back and attempted to handcuff Murphy. (*Id.*). In response, Murphy yelled "let go of me." (*Id.*). And

---

[5] Officer McKnight did not announce the crime as he arrested Murphy. But the Court assumes it was obstruction, as that is what Murphy was charged with (alongside assaulting a police officer and resisting arrest, but those latter two charges were related to events that occurred during the arrest).

ultimately, the officers were only able to place Murphy in handcuffs after (1) they took him to the ground, (2) Officer C. Blankenship struck him, and (3) Officer McKnight tased him (four times). (*Id.* at #1089; Doc. 44-1, #1442–43). The struggle lasted over a minute. (Doc. 42-2, #1089; *see* Doc. 40, 15:30–16:45). Murphy, injured during the arrest, was transported to the hospital, released that night, and then transported to Lawrence County Jail where he remained for approximately one hour, at which point he was released. (Doc. 42-2, #1089).

But the parties disagree on some of the other details, or at least the appropriate characterization of those details. Most notably, Defendants contend Murphy was "resisting arrest," (*id.*), but he says that was not the case, (Doc. 44-1, #1442). Luckily, Officer McKnight's body-camera footage sheds some additional light on that question. (*See* Doc. 40). During the arrest, Murphy shouted multiple times that he was *not* resisting arrest, including in response to when an officer stated that he *was* resisting. (*Id.* at 15:57, 16:16, 19:12, 20:19, 23:12, 23:45, and 28:00). However, Murphy also shouted "you cannot arrest me I have not done nothing wrong" (*id.* at 15:35), and, most importantly, the officers were only able to handcuff him after employing the techniques described above. Altogether, having watched the video footage, it appears that Murphy's primary "resistance" was that he did not place his hands behind his back to be handcuffed as McKnight instructed.

Later, Officer McKnight provided criminal affidavits to the Lawrence County Prosecutor's Office for charges including Obstructing Official Business, Resisting Arrest, and Assault on a Peace Officer. (Doc. 42-2, #1089). Those charges were

initially filed, but later dropped. (*Id.*). Murphy maintains that the prosecutor dropped the charges for lack of probable cause. (Doc. 44-1, #1444 (citing Pam Wagner's RFA Resp., Doc. 43-1, #1394 (admitting that Chief Wagner "was told by the Lawrence County Prosecuting Attorney's Office that the charges were being dismissed for lack of probable cause"))).

Based on these events, Murphy sued the four officer-Defendants, the City of Ironton, and Police Chief Pam Wagner (who he has since voluntarily dismissed). (Doc. 1; 10/20/2025 Not. Order). His Complaint asserts fourteen counts: (1) a § 1983 claim for violating his First and Fourteenth Amendment free-speech rights; (2) a state law claim for the same; (3–6) § 1983 claims against each officer-Defendant for excessive force in violation of his Fourth and Fourteenth Amendment rights; (7) a § 1983 claim against the officer-Defendants for unlawful arrest and seizure in violation of his Fourth and Fourteenth Amendment rights; (8) a § 1983 claim for false imprisonment in violation of his Fourth and Fourteenth Amendment rights; (9) a state law claim for the same; (10) a § 1983 claim against Defendants Wagner and the City of Ironton for "failure to hire, train, and supervise, and for customs, policies, and practices causing violations of the Fourth Amendment"; (11) a state law claim for assault and battery; (12) a § 1983 claim against Defendants McKnight and Wagner for malicious prosecution; (13) a state law claim for the same; and (14) a state law claim for intentional infliction of emotional distress. (*Id.* at #7–19).

Defendants now move for summary judgment on all claims. (Doc. 42). Murphy responded, (Doc. 44), and Defendants replied, (Doc. 45), so the motion is ripe for

5

review. Additionally, there are two ripe procedural motions raising Murphy's objections to the report of Defendants' expert Kevin R. Davis, (Docs. 18, 47).

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). Once the movant meets its burden, though, the nonmoving party may not rest on its pleadings, but rather must come forward with significant probative evidence to support its claim. *Celotex*, 477 U.S. at 324–25; *Lansing Dairy*, 39 F.3d at 1347. A party must support any assertions with evidence such as depositions, documents, affidavits, or other admissible evidence (or at the very least citing material that could "be presented in a form that would be admissible in evidence"). Fed. R. Civ. P. 56(c)(1), (2). If there is "a complete failure of proof concerning an essential element of the nonmoving party's case," then the Court will treat "all other facts [as] immaterial." *Celotex*, 477 U.S. at 323. And the nonmoving party cannot defeat summary judgment merely by pointing to *any* factual dispute. Indeed, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (bracket and emphases omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 247–48 (1986)). That is, the dispute must be both "genuine" (i.e., supported by evidence) and go to a "material fact" (i.e. a fact that could change the outcome).

Essentially, the appropriateness of summary judgment turns on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52). And in making that determination, the Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

## LAW AND ANALYSIS

### A.    Motions to Exclude Expert Testimony.

Because the Court ultimately grants the Motion for Summary Judgment (Doc. 42), it denies as moot both of Murphy's motions asking to exclude proposed expert Kevin R. Davis. (*See* Docs. 18, 47). Remember, at this stage the Court is already viewing the facts in the light most favorable to Murphy. So, the testimony of Defendants' proposed expert witness is largely irrelevant for deciding the present motion. And here, the body-camera footage of the incident in question demonstrates the relevant facts. In any event, Defendants' motion does not rely on that expert report in any meaningful way.[6] So the Court declines to weigh in on whether the

---

[6] The Defendants' Proposed Undisputed Facts, for example, only cite to the export report once. (Doc. 42-2, #1089, n. 2 (citing the report as Ex. A-1)). And that citation is to a portion of

expert's testimony would be admissible at trial. Therefore, the Court **DENIES** Murphy's motions, (Docs. 18, 47), as **MOOT**.

**B.      Motion for Summary Judgment.**

That brings us to the main event. Ultimately, Murphy's claims boil down to two alleged violations of his civil rights: (1) the officer-Defendants arrested him without probable cause; and (2) used excessive force in doing so. As to each, the Court concludes that the movants have met their burden of showing no genuine dispute, and that Murphy has failed in response to identify any remaining dispute as to any material fact regarding either alleged violation. Thus, Defendants are entitled to summary judgment. The Court discusses the specifics of that as to each of Murphy's fourteen claims below. But the Court addresses the fourteen counts in the order that makes the most sense analytically, rather than in the order Murphy presents them in his Complaint.

       **1.      Count VII: Murphy's Claim for Unlawful Arrest and Seizure Fails Because Officer McKnight Did Not Clearly Lack Probable Cause.**

Murphy alleges that his arrest was unlawful because Officer McKnight lacked probable cause. There is no dispute as to a material fact regarding the presence of probable cause—indeed, the Court has the video of the entire interaction. And while the "existence of probable cause is generally a question for the jury … [p]robable cause is a legal question for the Court *if the facts are not in dispute. Ellison v. Martin,*

---

the report that simply quotes the Incident Report from Officer McKnight regarding his use of his taser. (Doc. 42-1, #1063).

No. 1:17-cv-689, 2020 WL 7028454, at *7 (S.D. Ohio Nov. 30, 2020) (emphasis added) (citing *Penn v. Bergtold*, 803 F. App'x 900, 903 (6th Cir. 2020)). Here, at least considering the qualified immunity afforded to the officers, the Court finds that Officer McKnight (and by extension the other officer-Defendants) cannot be liable on Murphy's claim that the officer lacked probable cause to arrest him for obstruction.

Let's break that down a little. "Probable cause exists where the 'facts and circumstances within the officer's knowledge [] are sufficient to warrant a prudent person … in believing … that the suspect committed, is committing, or is about to commit an offense.'" *Smith v. City of Wyoming*, 821 F.3d 697, 715 (6th Cir. 2016) (quoting *Michigan v. DeFillippo,* 443 U.S. 31, 37 (1979)). But remember, because this is an action for civil damages, the "[o]fficers are entitled to qualified immunity unless they (1) violate a constitutional right (2) that was 'clearly established' at the time of the wrongdoing." *Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022) (citation omitted). And under that framework, the "plaintiff bears the burden of showing that the right was clearly established … [and] must point to a case showing that reasonable officers would have known their actions were unconstitutional under the specific circumstances they encountered." *Id.* (citing *Cunningham v. Shelby Cnty.*, 994 F.3d 761, 765–66 (6th Cir. 2021)). So, "[t]he ultimate question is whether the contours of the constitutional right involved were so clear that any reasonable police officer in [McKnight's] position would have realized his conduct violated the right." *Pullin v. City of Canton*, 133 F. Supp. 2d 1045, 1052 (N.D. Ohio 2001) (first citing

9

*Anderson v. Creighton,* 483 U.S. 635, 639–40 (1987); and then citing *Long v. Norris,* 929 F.2d 1111, 1115 (6th Cir. 1991)).

In sum, adding on this qualified immunity gloss means that for Murphy to hold McKnight liable for any claim based on his arrest sans probable cause, he must demonstrate that any reasonable officer in McKnight's position would have known probable cause was not present. Defendants, of course, argue that there was probable cause because Murphy violated (or at least it was reasonable for McKnight to think that he did) Ohio's obstruction statute. (Doc. 42, #1035–38); *see also* Ohio Rev. Code § 2921.31.

Under Ohio law, obstruction has five elements: "(1) an act by the defendant; (2) done with the purpose to prevent, obstruct, or delay a public official; (3) that actually hampers or impedes a public official; (4) while the official is acting in the performance of a lawful duty; and (5) the defendant so acts without privilege." *Smith,* 821 F.3d at 715 (citations omitted).[7] So, to demonstrate an actionable lack of probable cause, Murphy must point to facts showing that it would be unreasonable for any officer in McKnight's circumstances to believe at least one of those elements was present.

---

[7] Murphy maintains that only felony obstruction is an arrestable offense in Ohio. (Doc. 44, #1432, n. 2); Ohio Rev. Code § 2921.31. Felony obstruction requires the additional element of "a risk of physical harm to any person." Ohio Rev. Code § 2921.31. Absent that element, obstruction is a second degree misdemeanor. *Id.* But Ohio law states that a second degree misdemeanor can sustain a sentence of ninety days in jail. Ohio Rev. Code § 2929.24(A)(2). And Murphy points to no other support for his claim that misdemeanor obstruction is not an arrestable offense.

10

The Court starts where there is agreement. The parties do not dispute that the officers were engaged in a lawful duty (element 4), inventorying and searching Murphy's truck after the stop of Robinson. (Doc. 42-2, #1088). And from the body-camera footage, it is clear that Murphy's actions interrupted (and could reasonably have been understood as intending to interrupt) that search for nearly two minutes (elements 1, 2, and 3). (Doc. 40, 13:45–15:30). To expand on that a bit, Murphy arrived on the scene, stated that the truck in question belonged to him, raised concerns about the search, and repeatedly refused to move to where McKnight attempted to direct him. (*Id.*). All of that necessarily interrupted the officers' efforts to continue the search. Finally, Murphy had no privilege to do so (element 5). In short, it was reasonable for an officer in McKnight's situation to conclude that Murphy, who was clearly upset about the search of his truck, took these actions to impede the search of the vehicle, giving rise to at least a reasonable belief on McKnight's part that he had probable cause.[8]

True, as Murphy argues, "Ohio courts have emphasized the importance of the first element, the requirement that the defendant commit an affirmative act." *Smith*, 821 F.3d at 715. And "[a] person cannot be guilty of obstructing official business by doing nothing or failing to act." *Id.* at 715–16 (quoting *State v. Wellman*, 879 N.E.2d

---

[8] The Court need not weigh in on whether Murphy actually possessed the requisite intent to be *convicted* under Ohio Revised Code § 2921.31 or whether, for instance, he instead intended to prevent false evidence from being planted or to keep his possessions in the truck from being lost. Here, the probable cause and qualified immunity standards do serious work. The facts need only demonstrate that Officer McKnight could have reasonably believed that Murphy intended to obstruct the search. It matters not whether that was Murphy's actual intent, nor even if that was the most reasonable belief for McKnight to hold about Murphy's intent.

11

215, 218 (Ohio Ct. App. 2007)). Additionally, "[t]he affirmative-act requirement requires more than a failure to comply with an officer's request." *Wright v. City of Euclid*, 962 F.3d 852, 873 (6th Cir. 2020) (citation omitted). Here, Murphy points out the fact that his arrest came after he merely failed to comply (roughly six times) with Officer McKnight's direction on where to stand, which, he says, is not an affirmative act. (Doc. 44-1, #1440 (citing Doc. 40, 15:57, 16:16, 17:10, 19:12, 20:19, 23:12, 23:47, and 28:02)).

While the Court is not convinced that failing to comply *multiple* times cannot be an affirmative act,[9] that is a bit beside the point because that is not all that Murphy did. Rather, he *started* the interaction and inserted himself into the lawful inventory search of his truck—*that* was the affirmative act. In other words, Officer McKnight did not pick out a random person on the sidewalk and start issuing orders. Rather, the Officer issued his directions in *response* to Murphy's actions. The fact that Murphy did not comply with McKnight's requests to retreat to a certain location is only relevant insomuch as it prevented McKnight from returning to the search.

The fact that Murphy inserted himself into the officer's lawful investigation contrasts with those situations where courts have typically found a "failure to comply" insufficient to create probable cause. *See, e.g.*, *Wright*, 962 F.3d at 861, 873 (finding no probable cause for obstruction when officers stopped plaintiff in his car and he

---

[9] Some Ohio courts, for instance, have held that "a defendant's repeated failure to comply with officers' requests to exit the home constituted affirmative acts which supported a conviction for obstructing official business." *State v. Williams*, 265 N.E.3d 1264, 1271 (Ohio Ct. App. 2025) (citing *State v. Williams*, 2021-Ohio-4200, ¶ 26 (Ohio Ct. App. 2021)).

12

placed his hand on his center console instead of behind his back as officer handcuffed him); *Jones v. City of Elyria*, 947 F.3d 905, 915 (6th Cir. 2020) (finding no probable cause for obstruction when officers stopped plaintiff in a parking lot and he "[a]t most … refus[ed] to submit to a pat-down"); *Smith*, 821 F.3d at 705, 716 (finding no probable cause for obstruction when plaintiff withdrew her hand after an officer grabbed it while the officers were engaged in a child welfare visit). Here, the affirmative act consisted of Murphy coming to the scene and engaging with the officers about their search of the truck (in which he had not been a passenger), combined with his refusal to back away as directed. So, Murphy was not arrested solely based on a failure to comply with an order, *nor* was he arrested based on his speech alone. *See Patrizi v. Huff*, 690 F.3d 459, 464 (6th Cir. 2012) (citation omitted) ("Ohio courts have affirmed obstruction convictions premised on true speech only when that speech involved yelling, cursing, aggressive conduct, and/or persistent disruptions after warnings from the police against interrupting the investigation."). Accordingly, qualified immunity shields the officer-Defendants from liability for any of Murphy's claims predicated on an alleged lack of probable cause.

> **2. Counts III–VI: Murphy's Claims for Excessive Force Fail Because the Officers' Actions to Obtain Compliance with Their Orders Were Not Clearly Unlawful.**

Murphy also brings § 1983 excessive force claims against Officers McKnight, C. Blankenship, and Allison for violating his Fourth and Fourteenth Amendment

rights during the arrest. (Doc. 1, #10–12).[10] He alleges that the three officers used excessive force in their initial restraining and handcuffing, in taking him to the ground without reason to do so, in striking him "about his head and body while he [w]as handcuffed on the ground," and in McKnight deploying his taser repeatedly and unnecessarily (which Officers C. Blankenship and Allison allowed McKnight to do). (*Id.*).

"When reviewing Fourth Amendment excessive-force claims, courts invoke an objective-reasonableness standard, which is a fact-specific, totality-of-the-circumstances inquiry." *Hughey v. Easlick*, 3 F.4th 283, 289 (6th Cir. 2021) (citations omitted). Whether an officer's actions comport with that standard depends on "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citation omitted). And remember, qualified immunity applies here too, so Murphy must show that "existing caselaw … clearly and specifically hold[s] that what the officer[s] did—under the circumstances the officer[s] did it—violated the Constitution." *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015).

Turning to the factors *Graham* describes, the crime here, obstruction under Ohio Revised Code § 2921.31, does not strike the Court as a particularly serious one. While it can rise to the level of a felony if it creates a risk of physical harm,

---

[10] While he brings four counts, he only mentions the three officers who participated in the arrest. Officer B. Blankenship did not assist in the arrest and is not discussed in this portion of the Complaint. (Doc. 1, #10–12). So that "claim" fails.

interpreting the facts here in a light most favorable to Murphy suggests a misdemeanor violation. *Id.* Murphy did not obstruct the officers during a life-threatening situation, nor did he himself threaten to physically harm anyone.

Now, whether he posed a threat to the safety of the officers *during* the arrest (and use of force) is a different matter. But that question is intertwined with whether he resisted arrest—the primary issue the parties dispute.[11] That the parties focus their efforts there is not surprising. If Murphy was not actively resisting, the officers' actions were clearly unreasonable under existing case law. *See, e.g.*, *Osborn v. City of Columbus*, No. 2:20-cv-1229, 2022 WL 2159899, \*7 (S.D. Ohio June 15, 2022) (citing *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015)) (A person "has a clearly established constitutional right not to be tasered if he displays passive resistance or no resistance."), *aff'd,* No. 22-3570, 2023 WL 2523307 (6th Cir. Mar. 15, 2023).

But based on the undisputed facts in the record, the Court finds that Murphy did resist arrest, at least to the level that supports the force the officers used to subdue him. Typically, active resistance has "some outward manifestation—either verbal or physical—on the part of the suspect [that] suggest[s] volitional and conscious defiance." *Shumate v. City of Adrian*, 44 F.4th 427, 446 (6th Cir. 2022) (citing *Eldridge v. City of Warren*, 533 F. App'x 529, 534 (6th Cir. 2013)). It includes

---

[11] Defendants maintain that Murphy struck Officer McKnight in the face with a handcuff as Murphy resisted his other arm being handcuffed. (Doc. 42-2, #1089). Murphy disputes this point (and it is not clear on the video footage). (Doc. 44-1, #1442). And here we must interpret the facts in the light most favorable to Murphy. But the analysis does not turn on whether McKnight was in fact struck, rendering that a disputed, but *immaterial*, fact.

15

"physically struggling with, threatening, or disobeying officers." *Rudlaff*, 791 F.3d at 641 (quoting *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012)). "And it includes refusing to move your hands for the police to handcuff you, at least if that inaction is coupled with other acts of defiance." *Id.* (first citing *Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 94, 96–97 (6th Cir. 2012); and then citing *Williams v. Ingham*, 373 F. App'x 542, 548 (6th Cir. 2010)).

Based on the undisputed facts and video evidence here, it is clear that Murphy resisted Officer McKnight's attempt to handcuff him, and that this is what led to the ensuing struggle.[12] (Doc. 40, 15:30–16:45). It is also clear that the officers stopped employing force once they successfully handcuffed Murphy. Moreover, each of the techniques the officers used to gain compliance is a reasonable application of force when a suspect is resisting handcuffing. *See Bozung v. Rawson*, 439 F. App'x 513, 520 (6th Cir. 2011) (an officer reasonably employed a takedown to neutralize and handcuff the suspect); *Rudlaff*, 791 F.3d at 641 (citations omitted) ("Our cases firmly establish that it is *not* excessive force for the police to tase someone (even multiple times) when the person is actively resisting arrest."); *Brown-Mosby v. City of Detroit*, No. 4:22-cv-10336, 2023 WL 5486245, at *5 (E.D. Mich. July 31, 2023) ("[T]he right of a suspect to be free from strikes depends on whether the suspect is actively resisting arrest."), *report and recommendation adopted sub nom. Brown-Mosby v. Gadwell*, No. 22-

---

[12] Murphy maintains that he did not resist arrest. (Doc. 44-1, #1442). He yelled it at the time, (Doc. 40, 15:57, 16:16), and repeated it at his deposition, (Doc. 39, #956). However, his own expert concedes that he resisted arrest. (Doc. 27, #238). And more importantly, based on the video, it is clear to the Court that Murphy resisted being handcuffed, causing a struggle with the officers. (Doc. 40, 15:30–16:45). That is resisting an arrest.

16

10336, 2023 WL 5446712 (E.D. Mich. Aug. 23, 2023). So, the officers' actions were not clearly unreasonable in light of existing case law.

>   **3.     Counts I and II: Murphy's Speech-Retaliation Claims Fail Because His Arrest Was Lawful.**

Murphy brings a § 1983 First Amendment claim and a state law claim under Art. I, § 11 of the Ohio Constitution, arguing that the officer-Defendants arrested him in retaliation for his protected speech because they did so after he expressed his desire to video record (and began recording). (Doc. 1, #7–10). These claims have multiple problems. First, "[t]he plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest." *Hartman v. Thompson*, 931 F.3d 471, 484 (6th Cir. 2019) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 402 (2019)). Because Murphy has failed to do so, these claims fail.

And even if Murphy had proven the lack of probable cause, the undisputed facts fail to demonstrate a First Amendment claim. "A First Amendment retaliation claim has three elements." *Myers v. City of Centerville*, 41 F.4th 746, 759 (6th Cir. 2022). These include: "(1) the plaintiff engaged in protected conduct … ; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) … the adverse action was motivated at least in part by the plaintiff's protected conduct." *Id*. (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)). Murphy's claim does not make it past the first element. While Murphy certainly has a right to observe and film police officers on public property, McKnight ultimately arrested him on private property, where he "has no constitutionally protected right to trespass." *Healy v. Chung*, No.

17

2:22-cv-2074, 2025 WL 3041834, at *9 (S.D. Ohio Oct. 31, 2025) (citation omitted); (Doc. 40, 15:30).

And turning to the state claim, "the right to freedom of speech conferred under Article 1, Section 11 of the Ohio Constitution is not self-executing and does not create a private cause of action." *Place v. Warren Loc. Sch. Dist. Bd. of Educ.*, No. 2:21-cv-985, 2024 WL 964253, at *9 (S.D. Ohio Mar. 6, 2024). So that claim fails as well.

    **4.**     **Count X: Murphy's *Monell* Claim Fails Because He Cannot Tie the Alleged Violation of His Rights to Any Municipal Policy or Custom.**

To prevail on his *Monell* claim against the City of Ironton, Murphy "must show that the municipality's 'policy or custom' caused the violations of his … rights." *Austin v. Mosley*, No. 23-1425, 2025 WL 448879, at *2 (6th Cir. Feb. 10, 2025) (citing *Hardrick v. City of Detroit*, 876 F.3d 238, 243 (6th Cir. 2017)). Importantly, the Court's holding above that the officer-Defendants are entitled to qualified immunity does not, in and of itself, preclude Murphy from prevailing on a *Monell* claim. As the Sixth Circuit has explained, "if the legal requirements of municipal or county civil rights liability are satisfied, qualified immunity will not automatically excuse a municipality or county from constitutional liability, even where the municipal or county actors were personally absolved by qualified immunity, if those agents in fact had invaded the plaintiff's constitutional rights." *Scott v. Clay Cnty.*, 205 F.3d 867, 879 (6th Cir. 2000) (emphases omitted). But in the end, Murphy fails to create a dispute of material fact regarding his *Monell* claims, and so Defendants prevail as a matter of law.

18

In proving a *Monell* claim,

> [t]here are four methods of showing the municipality had … a policy or custom [that caused the violation]: the plaintiff may prove "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations."

*Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)). Murphy claims that methods 2, 3, and 4 are each present here. (Doc. 44, #1435–36). At the outset, the Court notes that each of the three methods fails for largely the same reason: Murphy fails to point to facts showing that the City of Ironton permitted a pattern of constitutional violations. Still, the Court addresses each in order.

First, regarding method 2, Murphy claims that as "Mayor Samuel Cramblit was the final decision-making authority … [b]y not permitting discipline … [he] ratified the officers' actions." (*Id.*). "An official acting with final decision-making authority may ratify the unconstitutional acts of its employees in two ways. The first is through 'affirmative approval of a particular decision made by a subordinate.'" *Scott v. Louisville/Jefferson Cnty. Metro Gov't*, 503 F. Supp. 3d 532, 537–38 (W.D. Ky. 2020) (quoting *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993)). "The second is by 'failing to meaningfully investigate and punish allegations of

19

unconstitutional conduct.'" *Id.* (quoting *Wright,* 962 F.3d at 882) (additional citation omitted). Murphy appears to be arguing the second,[13] but in doing so, falls short.

True, he points to Chief Wagner's statement that "she was told by the Mayor that the City would not support suspensions or terminations based off the incident complained of in Plaintiff's Complaint." (Doc. 43-1, #1393). Read in the light most favorable to Murphy, this could suggest that the mayor at the very least did not approve of significant discipline for McKnight's actions. But that does not suffice. A claim based on a failure to investigate or discipline "requires 'not only an inadequate investigation in this instance,' but also 'a clear and persistent pattern of violations' in earlier instances." *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 495 (6th Cir. 2020) (quoting *David v. City of Bellevue*, 706 F. App'x 847, 853 (6th Cir. 2017)). That rule basically arises from the plaintiff's need to show causation—a single, after the fact, failure to discipline Officer McKnight for this incident could not have *caused* Murphy's alleged injuries. Rather, there must be some "series of investigative [or disciplinary] failures [that occurred] *before* the plaintiff's injury … [that] suggests[s] that the local entity's custom *led to* the employee's harmful action in the plaintiff's own case." *Id.* (emphases added) (citation omitted). All Murphy points to in this regard is one previous incident of Officer McKnight employing a taser (and not

---

[13] Such arguments are typically characterized as "failure to investigate" claims. *See, e.g.*, *Pineda*, 977 F.3d at 495. While Murphy instead alleges a failure to discipline, that is properly viewed as a subset of a failure to investigate, as both lead to *Monell* liability for the same reason—a pattern of either could cause officers to believe that they will not be held to account for the specific type of action at issue. *Hart v. Michigan*, 138 F.4th 409, 425 (6th Cir. 2025) (dismissing "the theory that the City ratified the officers' unconstitutional conduct by insufficiently investigating *and punishing* that conduct" (emphasis added)).

20

receiving discipline) in a case where the charges were eventually dropped by the prosecutor. (Doc. 44, #1436). That is not enough to show "a clear and persistent pattern of violations," and so Murphy's ratification claim fails. *Pineda*, 977 F.3d at 495 (citation omitted).

Turn to method 3. A failure-to-train claim likewise "requires a showing of 'prior instances of unconstitutional conduct demonstrating that the [municipality] ha[d] ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" *Burgess*, 735 F.3d at 478 (quoting *Miller v. Sanilac Cnty.*, 606 F.3d 240, 255 (6th Cir.2010)). Here, all Murphy points to as evidence is that Chief Johnson, the City of Ironton's Rule 30(b)(6) representative, "fail[ed] to know the training categories for [officers in] 2022" and (again) that McKnight allegedly had one instance of previous taser misuse. (Doc. 44, #1435–36). That is insufficient to show Murphy's constitutional injury (if there is one) was caused by a failure to train "amount[ing] to deliberate indifference" as the law requires. *Arrington-Bey v. City of Bedford Heights, Ohio*, 858 F.3d 988, 994 (6th Cir. 2017) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). As the Court found above, there was no violation of a clearly established right and "a municipal policymaker cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established." *Id.* (citations omitted).

Finally, as to method 4, not unlike a failure to investigate claim, a "custom-of-tolerance claim requires a showing that there was a pattern of inadequately

21

investigating similar claims." *Burgess*, 735 F.3d at 478 (first citing *Thomas v. City of Chattanooga,* 398 F.3d 426, 433 (6th Cir. 2005); and then citing *Leach v. Shelby Cnty. Sheriff,* 891 F.2d 1241, 1248 (6th Cir.1989)). Again, Murphy points only to a single alleged 2021 incident where McKnight "improperly deployed a TASER and filed a criminal complaint" that was eventually dismissed by the prosecutor for lack of probable cause and McKnight "faced no discipline." (Doc. 44, #1436 (citing Doc. 43-1, #1396–97)). This "evidence"—i.e., one allegedly similar incident—falls short of "a sufficient number of prior incidents of a sufficiently similar type of misconduct to demonstrate that a municipal entity was on notice or constructive notice." *Assi v. Hanshaw*, 625 F. Supp. 3d 722, 750 (S.D. Ohio 2022). Or more simply, Murphy has not identified "a clear and persistent pattern of illegal activity." *Thomas*, 398 F.3d at 429.

In sum, Murphy fails to point to a dispute of material fact as to the existence of any policy or custom that caused the violation of rights that he alleges here, and thus his *Monell* claims fail as a matter of law.

> **5.** **Counts VIII, IX, XI, XII, XIII, and XIV: Murphy's Remaining State Law Claims Fail Because the Defendants Are Immune Under Ohio Law.**

That leaves Murphy's remaining state law claims. As to these claims, recall that Murphy concedes that the officer-Defendants acted within the scope of their employment.[14] (Doc. 1, #3–4 (alleging that the officers were acting "in furtherance of [their] employment"). That creates a hurdle for Murphy. Under Ohio law, officers

---

[14] Murphy also conceded at oral argument that his claims against the City are barred.

acting within the scope of their employment are immune from liability for state claims unless they acted "with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b). By and large, Murphy failed to address these claims at all in his Response to the Motion for Summary Judgment (Doc. 44). But at oral argument, he renewed his assault and battery claim (Count XI), while acknowledging that he would need to point to maliciousness to overcome state immunity. In an effort to do so, Murphy points to a portion of McKnight's deposition that he says shows maliciousness. (*See* Doc. 38, #844–46). But the cited portions do not say anything about any of the other officer-Defendants, and they don't even create a genuine dispute as to McKnight.

At his deposition, after Murphy's counsel questioned him, Officer McKnight stated that if Murphy "would've showed up and acted with good character and not been all over the place and aggressive and caused a scene like he did" then McKnight would have released him. (*Id.* at #844). McKnight also observed that "I wouldn't have had a problem if he—if that wouldn't have happened." (*Id.* at #846). During another line of questioning, Officer McKnight stated that when he used his taser he intended to cause pain because he "was using pain compliance to get [Murphy] to comply." (*Id.* at #892).

No reasonable jury could find that McKnight acted maliciously based on these statements. "'[M]alice' for the purposes of subsection (b) refers to a willful and intentional design to do injury, or the intention or desire to harm another, through conduct which is unlawful or unjustified." *Johari v. City of Columbus Police Dep't,*

186 F. Supp. 2d 821, 831 (S.D. Ohio 2002) (citation omitted). And such maliciousness "implies more than a lack of probable cause." *Id.* Here, the Court has found probable cause to be present (or at least not clearly absent). And Murphy's assault and battery claim fails for another simple reason. "To prove assault and battery under Ohio law, [Murphy] must establish that [McKnight] unlawfully touched him with the intent of inflicting injury or creating fear of injury." *Id.* at 833 (citing *Blankenship v. Parke Care Ctr., Inc.*, 913 F. Supp. 1045, 1052 (S.D. Ohio 1995)). Here, as discussed above, any "touching" by McKnight was lawful, as it was a permissible use of force to overcome active resistance in effectuating an arrest.

At oral argument, Murphy conceded that the remainder of his state claims fail as a matter of law. And the Court agrees that, even apart from the Defendants' immunity, each claim is dead on arrival.[15] *See, e.g.*, *Kareva v. United States*, 9 F. Supp. 3d 838, 845 (S.D. Ohio 2014) (citation omitted) ("[A]ny claim for false imprisonment against a government actor must fail."); *Barstow v. Waller*, 2004-Ohio-5746, ¶ 46 (Ohio Ct. App. 2004) ("In a claim for malicious criminal prosecution, the plaintiff must show … lack of probable cause.")[16]; *Turkoly v. Gentile*, 2021-Ohio-965,

---

[15] Murphy also brought a *federal* malicious prosecution claim, which fails for the same reason as his § 1983 unlawful arrest claim—his failure to show a clear lack of probable cause. *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010) (citations omitted).

[16] True, the Court did not explicitly find that probable cause was present, only that Murphy failed to demonstrate that its absence was clearly established for qualified immunity purposes. But that distinction does not make a difference when the officer-Defendants possess similar immunity for state law claims. *See Hopper v. Phil Plummer*, 887 F.3d 744, 759 (6th Cir. 2018) (citations omitted) ("When federal qualified immunity and Ohio state-law immunity under § 2744.03(A)(6) rest on the same questions of material fact, we may review the state-law immunity defense through the lens of the federal qualified immunity analysis.").

24

¶ 34 (Ohio Ct. App. 2021) ("Parties generally cannot be held liable under a theory of intentional infliction of emotional distress for having performed an action they were legally entitled to perform." (quotation omitted)). Accordingly, because Murphy fails to point to any dispute of material fact, and all of his claims fail as a matter of law, the Court grants Defendants' Motion for Summary Judgment. (Doc. 42).

## CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. 42). The Court also **DENIES** Murphy's Motion in Limine (Doc. 18) and Motion to Exclude (Doc. 47) defense expert Kevin R. Davis as **MOOT**. Consistent with that, the Court **DIRECTS** the Clerk to enter judgment for Defendants and to **TERMINATE** this matter on the Court's docket.

**SO ORDERED.**

March 26, 2026
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

25